# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

TRACY CREGO,

    Plaintiff,

    v.                                                            Case No. 05-C-0994

MILWAUKEE ELECTRIC TOOL
 CORPORATION,

    Defendant.

## DECISION AND ORDER

    The plaintiff, Tracy Crego, who is proceeding pro se, filed a complaint on September 15, 2005, which she amended on January 31, 2006, alleging a claim of discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and a claim of retaliatory discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Title VII). Subsequently, the defendant filed a motion for summary judgment. (Docket #29). In response, the plaintiff filed a letter stating that she did not submit additional evidence because she had none to present. This motion will be addressed herein.

    The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United

States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

### **Standard for Summary Judgment**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267; see also, Celotex Corp., 477 U.S. at 324; Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's

-2-

Case 2:05-cv-00994-PJG   Filed 09/27/07   Page 2 of 19   Document 39

pleadings, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial").

When deciding a motion for summary judgment, all inferences are taken in the light most favorable to the nonmoving party. Matter of Wade, 969 F.2d 241, 245 (7th Cir. 1992). Defeating summary judgment requires more than just a "swearing match"; rather, the nonmoving party must present some evidence that a genuine issue of material fact exists. Wade, 969 F.2d at 245. Nonetheless, matters of credibility are not subject to resolution upon summary judgment. Wilson v. Williams, 997 F.2d 348, 350 (7th Cir. 1993).

## **Relevant Undisputed Facts**[1]

Defendant Milwaukee Electric Tool Corporation (METCO) is a leading manufacturer and marketer of heavy-duty, portable electric power tools and accessories. It has its principal place of business and corporate office in Brookfield, Wisconsin. Plaintiff Tracy Crego resides in Horicon, Wisconsin.

In December 1999, defendant METCO hired the plaintiff as an accounts receivable clerk. She was promoted to the position of lead accounts receivable clerk in late 2000. As the lead clerk, the plaintiff was responsible for getting work done in her own accounts and she also was the "go-to" person for the other clerks. (Deposition of Tracy Crego [Crego Dep.] at 69). As the lead clerk, she needed to be at work to provide the other clerks with assistance.

On September 3, 2004, defendant METCO terminated the plaintiff's employment. Defendant METCO told the plaintiff that it was terminating her employment because she

---

[1]The relevant undisputed findings of fact are taken from the defendant's proposed findings of fact and the plaintiff's complaint to the extent they are undisputed. Because the plaintiff's complaint is verified, 28 U.S.C. § 1746, as of course an affidavit must be, Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir. 1985), those parts of the complaint that satisfy the requirements of Rule 56(e) are affidavit material. Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996).

-3-

already had used up all of her available time off and then was absent from work again on September 2, 2004. (Crego Dep. at 121-22, 153-54). Robert Peterson, METCO's credit manager who was the plaintiff's direct supervisor at the time her employment was terminated, made the decision to terminate her employment. (Crego Dep. at 46-47). At all relevant times, Diane Rudy was METCO's director of Human Resources and Diane Mantei was the corporate administrator - Health Services for the defendant.

Beginning on January 9, 2004, the plaintiff took a five-week family and medical leave of absence due to her "severe headaches" and "dizziness." (Crego Dep. at 71, Exhs. 6, 8-10). On February 17, 2004, Mary Laan, PA-C at Pain Rehabilitation Associates, completed a work capacity form which stated that the plaintiff could work a six-hour work day. (Crego Dep. at 78-79, Exh. 11). The plaintiff returned to work on a reduced work schedule. The plaintiff then provided another release from Ms. Laan that indicated that the plaintiff could work six hours a day starting on March 1, 2004. (Crego Dep. at 81-82, Exh. 13). It was the plaintiff's understanding that she was cleared to work four to six hours a day. See Crego Dep. at 82. Defendant METCO continued to accommodate this reduced work schedule.

The plaintiff took another family and medical leave from March 26, 2004, through April 16, 2004, in order to undergo surgery for a deviated septum. (Crego Dep. 86-87, Exh. 14). Dr. Edith McFadden, the physician who performed the surgery on the plaintiff, released the plaintiff to return to work "with no restrictions" on April 19, 2004. (Crego Dep. 88-89, Exh. 15). Dr. McFadden told the plaintiff that she should return to work.

On April 19, 2004, the plaintiff obtained a work capacity form from a different health care provider – Ms. Laan – which stated that the plaintiff "may not work until re-evaluation by a physician." (Crego Dep. 89, Exh. 16). Two days later, on April 21, 2004, Ms. Laan released

-4-

the plaintiff to return to work four to six hours a day beginning on April 22, 2004. (Crego Dep. 92-93, Exh. 17). The plaintiff returned to work with this reduced work schedule. (Declaration of Diane Rudy [Rudy Decl.], ¶ 7, Exh. A at 3). Between April 19 and April 22, 2004, the plaintiff was receiving physical therapy. On April 28, 2004, Ms. Laan released the plaintiff to return to work six to eight hours a day. (Crego Dep. at 94, Exh. 18). Defendant METCO accommodated this reduced work schedule.

The plaintiff missed work from May 6, 2004, through May 14, 2004, and she provided an excuse from Ms. Laan and a physician at Pain Rehabilitation Associates for this absence. Effective May 17, 2004, the plaintiff was released to return to work four to six hours. At this point in time, the plaintiff had exhausted her twelve-week entitlement to FMLA leave. (Rudy Decl. ¶ 8). Nonetheless, defendant METCO accommodated the plaintiff's reduced work hours. The plaintiff missed work on May 20, 2004, May 21, 2004, and May 24, 2004. (Rudy Decl. ¶ 9, Exh. A at 3).

The four to six work hour restriction, which was effective on May 17, 2004, remained in place through June 29, 2004, at which time the plaintiff was released to return to work six to eight hours a day. (Crego Dep. at 106-07, 113, Exhs. 24, 25, 27). Defendant METCO continued to accommodate the plaintiff's restrictions through June, 2004, even though at that time, she had no more paid time off and she had exhausted her FMLA leave. (Crego Dep. at 114, 117).

The plaintiff was released to work without any restrictions on July 26, 2004 and returned to work on a full-time basis. (Crego Dep. at 115-16, Exh. 29). The plaintiff requested that her hours be returned to what they were before she went on medical leave (7:00 a.m. - 3:30 p.m.), but her request was denied. (Complaint at 3).

-5-

On September 2, 2004, the plaintiff called Mr. Peterson and left a message that she would not be coming into work because she was "up sick all night." (Complaint at 3; Crego Dep. at 119). She also mentioned in the message that she was in the process of moving and that she would try to call him back later. (Crego Dep. at 119-120). Because the plaintiff was in the process of moving, her telephone was not yet hooked up. (Complaint at 5). The plaintiff did not call Mr. Peterson back that day. The plaintiff had planned to use one of the two floating holidays that she had remaining, but was told she could not do so. (Complaint at 5).

On September 3, 2004, the plaintiff met with Mr. Peterson and Ms. Rudy. Mr. Peterson and Ms. Rudy advised her that she was terminated because she was absent on September 2, 2004, and had no available time off. (Crego Dep. at 121-22). In total, from January 1, 2004, to the time of her termination on September 3, 2004, the plaintiff missed "672.30 hours of work which is the equivalent of 84 days of work." (Rudy Decl., ¶ 8 and Exh. A).

According to the plaintiff, she is disabled mainly due to headaches, but she also has neck pain and back pain. (Crego Dep. at 54). Her headaches are "mainly tension" headaches, not migraines, which she believes are caused, in part, by a cyst known as a "mangioma" that causes pain and by pain from temporomandibular joint disorder (TMJ). Other than the mangioma and the TMJ, which contribute to the plaintiff's neck and back pain, the plaintiff is not aware of any other causes of her headaches.

The plaintiff first began experiencing these headaches in 2000. Beginning in 2004, she started to get these headaches "24/7." (Crego Dep. at 55). The plaintiff was "feeling better" when she was released to return to work full-time, without restrictions, on July 26, 2004. (Crego Dep. at 116).

-6-

After her return to work full-time, in late July 2004, the plaintiff's headaches limited her daily functioning in the following way:

> I would just have to not be at the computer as much as I used to. Like sometimes you – you have an application that will take over an hour, and I just couldn't do that anymore. I have to break it up. So I wasn't just staring at the screen. When I was released full-time, I was doing better then. But the light situation put me back a great deal.

(Crego Dep. at 63-64). The light situation, plaintiff's headaches and her inability to sit and read the computer screen for as long as she used to did not prevent her from continuing to work. Other than the inability to sit and read the computer screen for as long as she used to, there was "no other way in which [the plaintiff's] daily functioning was limited by her headaches" following her return to work full-time in July 2004. (Crego Dep. at 64). The plaintiff does not know if her neck pain was contributing to her headaches following her return to work full-time in July 2004. (Crego Dep. at 64).

In 2004, the plaintiff, a single parent of four minor children, was able to care for her children and get them ready for school and drive them to school and doctor appointments. (Crego Dep. at 65-66). She also prepared meals for her children. Although it was difficult for the plaintiff to grocery shop, she is able to grocery shop by taking her oldest daughter with her to the store.

The plaintiff's headaches made her "dizzy" and made it difficult for her to do activities with her children, such as "swimming at the pool," "go[ing] to the park," and "shopping," and going to her children's school functions. (Crego Dep. at 62, 66-67). She was able to take her children swimming and shopping "a couple times here and there" in 2004, but not as often as she used to. (Crego Dep. at 67).

-7-

The plaintiff was able to do housework and cleaning in 2004, although "not like [she] used to." (Crego Dep. at 66). She also was able to watch television and dated "a little bit" in 2004. (Crego Dep. at 67).

The plaintiff identified Jean Jordan and Pam Schubert as two METCO employees who were not terminated despite also having used up all of their available paid and unpaid time off and then missing work again. (Crego Dep. at 156-57). Ms. Jordan was not supervised by Mr. Peterson. With respect to Ms. Schubert, the plaintiff testified that "I don't have any evidence of it," but that people in the department told her "that Pam Schubert always ran out of time at the end of the year. But I don't know the exacts of that either." (Crego Dep. at 157-58). She did not know what people in the department told her this. Other than Ms. Jordan and Ms. Schubert, the plaintiff did not identify any other METCO employees who also used up all of their available paid and unpaid time off and then missed work again, but were not terminated. (Crego Dep. at 158).

The plaintiff stated that Angela Rodosevich, another of her former supervisors at METCO, regularly would approve employees leaving early for medical appointments as long as they made up the time. (Crego Dep. at 152). The plaintiff named several individuals who Ms. Rodosevich permitted to do this, but she does not know whether any of these employees already had exhausted all of their paid and unpaid time off when Ms. Rodosevich permitted them to leave early for medical appointments. None of these employees whom Ms. Rodosevich allegedly permitted to leave early for medical appointments had missed the same amount of work that the plaintiff had missed. (Crego Dep. at 153). Ms. Rodosevich did not make the decision to terminate the plaintiff.

-8-

When asked to identify all facts that she relies on in support of her claim that METCO terminated her because of her disability and not because she exhausted her available time off in 2004, and then missed additional work, the plaintiff testified that:

> I know I missed a lot of work that year, but I wasn't under the impression that my job was at risk because of my disability.

(Crego Dep. at 131). She further testified that:

> Like as far as like the lights when they were off and then turned on, it was kind of like a – honestly, like a punch in the face to me. When you don't suffer headaches every day, you have no idea how bad it is to be under really, really, bright lights.

(Crego Dep. at 131). When asked of there were any other facts, apart from those she already testified about to support her claim that defendant METCO had terminated her because of her disability, and not because she exhausted her available time off in 2004 and then missed additional work, the plaintiff testified that she did not know. (Crego Dep. at 132).

At some point in the spring of 2004, prior to the plaintiff's return to work full-time without restrictions, defendant METCO turned off the lighting over the plaintiff's cubicle at her request to accommodate the plaintiff's headaches. (Crego Dep. at 144-45). In August 2004, following the plaintiff's return to work full-time without restrictions, the lights over her cubicle were turned back on. (Crego Dep. at 146). The bright lights caused her to have a flare-up and she had to see her doctor. (Complaint at 5). After the plaintiff's return to full time work, new lights were put in above her workspace. After the plaintiff complained that the new lights were too bright, defendant METCO permitted her to move to a different cubicle where the lights were less bright. (Crego Dep. at 147). The move did not solve the problem. When the plaintiff received a note from her doctor about the lights and presented it to the defendant, defendant METCO installed less bright "natural lights" over the plaintiff's cubicle at her request. (Crego Dep. at

-9-

148-49). Defendant METCO put in the natural lights about a week after the plaintiff provided the doctor's note. (Crego Dep. at 150). The plaintiff worked a full schedule through the rest of the month of August 2004.

Sometime prior to the fall of 2001, the plaintiff had a consensual sexual relationship with Dan June, her then-supervisor. (Crego Dep. at 38-39). In the fall of 2001, the plaintiff informed Mr. June that she did not wish to continue their sexual relationship. According to the plaintiff, Mr. June treated her "basically like crap" after she broke off their relationship. (Crego Dep. at 39). In approximately February 2002, the plaintiff reported Mr. June's conduct to Ms. Rudy of defendant METCO's Human Resources Department. (Crego Dep. at 39-40).

Ms. Rudy met with the plaintiff and indicated that defendant METCO would investigate her claims. Within a few days after the plaintiff spoke to Ms. Rudy about Mr. June, his employment at METCO ended. (Crego Dep. at 40-41). (Amendment to Complaint at 1). The plaintiff believes that METCO terminated her employment in September 2004 because of the complaint she made against Mr. June in February 2002, her complaint about discrimination and "all the complaints that [she] filed." (Crego Dep. at 44).

Neither Mr. Peterson, Ms. Mantei nor Ms. Rudy ever made any statements to the plaintiff indicating that defendant METCO was terminating her in retaliation for her complaining about sexual harassment by Mr. June. (Crego Dep. at 47-48). The plaintiff testified that after Mr. June was terminated, a lot of people at work would not talk to her. The plaintiff referenced a "big rumor mill," but she did not believe Mr. Peterson was part of that rumor mill. (Crego Dep. at 128, 131).

When asked to identify any other facts that she relies on in support of her claim that defendant METCO terminated her because she complained about sexual harassment by Mr.

-10-

June, and not because she exhausted her available time off in 2004 and then missed additional work, the plaintiff testified that she made a complaint to Ms. Rudy about her "work hours." (Crego Dep. at 129). When the plaintiff complained to Ms. Rudy about her "work hours," she did not mention the June incident or her belief that defendant METCO was not permitting her to change her work hours because she had previously complained about Mr. June. Instead, the plaintiff thinks that she complained to Ms. Rudy that the refusal to permit her to change her work hours was because of "discrimination." (Crego Dep. at 129).

The plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC) on approximately March 7, 2005, alleging discrimination based on disability in violation of the Americans with Disabilities Act, as amended (Crego Dep. at 51-52, Exh. 5). In the box on the EEOC Charge marked "Date(s) Discrimination Took Place," the plaintiff noted "08-01-04 [to] 09-03-04." (Crego Dep., Exh. 5). The EEOC Charge contains no allegations that the plaintiff was retaliated against for complaining about sexual harassment by her then supervisor in approximately February 2002. (Crego Dep. Exh. 5).

## **ANALYSIS**

The plaintiff's amended complaint alleges discrimination based on disability in violation of the ADA and retaliation in violation of Title VII. The plaintiff asserts that she provided the defendant with notice of a medical problem and requested accommodation for her disability. The plaintiff also contends that she was discharged in retaliation for reporting sexual harassment by a prior supervisor.

At the outset, the defendant asserts that the plaintiff's Title VII claim of retaliatory discharge was not in her charge to the EEOC and is far beyond the scope of her EEOC charge. Therefore, the defendant maintains that the Title VII claim must be dismissed.

-11-

Generally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge, or claims that are reasonably related to the allegations of the charge and grow out of such allegations. McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 481 (7th Cir. 1996) (citations omitted). This standard is met if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge. Cheek v. Western and Southern Life Ins. Co., 31 F.3d 497, 501 (7th Cir. 1994). "The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." Id.

In this case, the plaintiff's EEOC charge alleges that the discrimination took place between August 1, 2004 and September 3, 2004, the date her employment was terminated. In her Charge of Discrimination, the plaintiff sets out her employment and medical leave history her request to Bob Peterson, Collections Manager, in August 2004 to change her work hours. She states that Mr Peterson denied her request, even though other employees were allowed to change their work hours upon request. The charge alleges mistreatment only by Mr. Peterson. The plaintiff further states that on September 2, 2004, she called in to work and reported an absence due to illness and was terminated the following day. The plaintiff checked only the box marked "Disability" as the basis for her claim and cited only the ADA.

A review of the Charge of Discrimination shows that the plaintiff's allegations of discrimination in the EEOC charge describe different conduct and involve different individuals than her Title VII claim. The allegations make no mention of any harassment or retaliation

-12-

based on sex and have nothing to do with sexual harassment or retaliation based on sexual harassment.

Accordingly, even construing the nature of the plaintiff's claims liberally, the court finds that there is no relationship between the allegations in the plaintiff's EEOC charge and the Title VII retaliation claim in her amended complaint. Thus, the plaintiff's EEOC charge fails to provide a basis for her claims based on sexual harassment/retaliation.

Even if the court were to conclude that the plaintiff's EEOC charge could be construed to include her Title VII claims, the plaintiff has not established a prima facie case of retaliation based on her sex. In Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002), the court clarified the proper standard for summary judgment in a case involving a claim of retaliation for complaining about employment discrimination. The court laid out two distinct ways for a plaintiff to establish a prima facie case for unlawful retaliation to avoid summary judgment. The first way "is to present direct evidence (evidence that establishes without resort to inference from circumstantial evidence that [the plaintiff] engaged in protected activity (filing a charge of discrimination)) and as a result suffered the adverse employment action of which he complains." Id. The second way is adapted from the analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). It requires that a plaintiff establish that after filing a charge, she was subjected to an adverse employment action even though the she was performing the job satisfactorily and no similarly situated employee who did not file a charge was subjected to the adverse employment action. Id.

Here, the plaintiff has not presented any direct evidence of retaliation. In order to establish a prima facie case of retaliation using indirect evidence, the plaintiff must show that: 1) after filing a charge, the plaintiff was subject to an adverse employment action; 2) at the time

-13-

the plaintiff was performing her job satisfactorily and 3) no similarly situated employees who did not file a charge were subjected to an adverse employment action. Hudson v. Chicago Transit Authority, 375 F.3d 552, 560 (7th Cir. 2004); see also, Stone, 281 F.3d at 644. To determine whether employees are similarly situated for the purpose of analyzing a Title VII retaliation claim "the employees must be 'directly comparable in all material respects.'" Hudson, 375 F.3d at 561 (quoting Ajayi v. Aramark Bus. Servs., 336 F.3d 520, 531-32 [7th Cir. 2003] [other citation omitted]). "Under the indirect method of proof, failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim. Hudson, 375 F.3d at 560.

In this case, the plaintiff has not presented any evidence to demonstrate that she was singled out and that other similarly situated employees who do not file a charge of discrimination were treated more favorably. Therefore, the plaintiff has failed to establish a prima facie case of retaliation under Title VII. Accordingly, the defendant's motion for summary judgment as to the plaintiff's sexual harassment/retaliation claim will be granted.

The plaintiff also claims that the defendant terminated her employment because of an alleged disability in violation of the ADA. The defendant maintains that the plaintiff has failed to make a prima facie case of discrimination under the ADA. First, the defendant asserts that the plaintiff fails to establish that she had an ADA covered disability. Specifically, the defendant maintains that the plaintiff did not have an actual disability, cannot demonstrate that she had a "record of" a disability, and has conceded that the defendant did not "regard her as disabled." The defendants also assert that the plaintiff cannot establish that she was a "qualified individual" able to perform the essential functions of her job. Finally, the defendants contend that the plaintiff cannot establish that similarly situated non-disabled employees were treated more favorably than the plaintiff.

-14-

Under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., an employer unlawfully discriminates against a "qualified individual with a disability" when it fails to make "reasonable accommodations to the known physical or mental limitations" of the disabled employee, unless to do so would impose an "undue hardship" on the employer. §§12112(a), (b)(5)(A). In order to make out a prima facie case of discrimination under the ADA a plaintiff must show: (1) that she suffers from a disability as defined in the statutes; (2) that she is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that she has suffered an adverse employment action as a result of her disability. Jackson v. City of Chicago, 414 F.3d 806, 810 (7th Cir. 2005) (citing Silk v. City of Chicago, 194 F.3d 788, 798 [7th Cir. 1999]).

In addressing the first prong of a prima facie case, the court must determine whether the plaintiff suffered from a disability as defined in the statute. Not all plaintiffs with health conditions have a disability within the meaning of the ADA. Nawrot v. CPC Intern., 277 F.3d 896, 903 (7th Cir. 2002) (citing Christian v. St. Anthony Med. Ctr., Inc., 117 F.3d 1051, 1053 [7th Cir. 1997] ["The Act is not a general protection of medically afflicted persons."]). To claim the protection of the ADA, plaintiffs must come within the coverage of the statutory definition of disability. Nawrot, 277 F.3d at 903 (citing Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944, 950 [7th Cir. 2000]).

The ADA defines "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). The claims asserted by the plaintiff do not implicate the definitions set forth in subsections B and C. The plaintiff does not assert that she had a record of a physical impairment (i.e., that she

-15-

had a history of, or was misclassified as having a physical impairment). She asserts that at the time of her termination she was disabled. The plaintiff also does not assert that the defendant regarded her as disabled. Rather, she maintains that the defendant did not believe that she was disabled. Thus, the court will determine whether the plaintiff suffered from a physical or mental impairment that substantially limits one or more of her major life activities.

In analyzing whether the plaintiff meets this definition, the court must "conduct a three-step inquiry. The court must determine whether the plaintiff's condition constitutes an impairment under the ADA, whether the activity upon which the plaintiff relies constitutes a major life activity, and whether the impairment substantially limited the performance of the major life activity." E.E.O.C. v. Sears Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005) (citing Bragdon v. Abbott, 524 U.S. 624, 631[1998]).

Generally, the ADA regulation define "physical or mental impairment" as "(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 CFR 1630.2(h).

The plaintiff asserts that she suffers from headaches, which are "mainly tension" headaches, as well as related neck and back pain. The undisputed facts establish that the plaintiff first began experiencing these headaches in 2000 but beginning in 2004, she started to get them all day every day. The undisputed facts further establish that beginning on January 9, 2004, the plaintiff took a five-week family and medical leave of absence due to her "severe

headaches" and "dizziness." (Crego Dep. at 71, Exhs. 6, 8-10). The undisputed facts also establish that on March 1, 2004, Mary Laan, PA-C at Pain Rehabilitation Associates, released the plaintiff to work six hours a day. Subsequently, the plaintiff took another family and medical leave in order to undergo surgery for a deviated septum. Although the plaintiff was released by the surgeon to return to work with no restrictions on April 19, 2004, Ms. Laan did not allow the plaintiff to return to work until April 22, 2004. At that time, Ms. Laan released the plaintiff to return to work four to six hours a day and on April 28, 2004, she released the plaintiff to return to work six to eight hours a day. The undisputed facts further establish that by July 26, 2004, the plaintiff was released to work without any restrictions and she returned to work on a full-time basis.

Although at the time of her termination, the plaintiff was released to full-time work, the plaintiff's headaches meet the ADA's definition of "physical impairment." Accordingly, the court will determine whether the activity upon which the plaintiff relies is a "major life activity." "Major life activities" include "basic functions of life" "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working — those rudimentary activities 'that the average person in the general population can perform with little or no difficulty.'" Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 505 (7th Cir. 1998) (citations omitted).

The undisputed facts establish that after her return to work full-time in late July 2004, the plaintiff's headaches limited her ability to sit and read the computer screen for as long as she used to. Other than that, however, there was "no other way in which [the plaintiff's] daily functioning was limited by her headaches." (Crego Dep. at 64). The plaintiff was able to walk,

-17-

drive, care for herself and her minor children, take her children to school and doctor's appointments, prepare meals, clean, watch television and date.

Thus, the only alleged "life activity" that the plaintiff claims to have been substantially limited in performing at the time of her termination from METCO was the ability to read a computer screen for long periods of time. The court of appeals for this circuit has held that being able to read all day long (or, as was the case, being able to read 80 percent of the workday) is not a major life activity. See Szmaj v. American Tel. & Tel. Co., 291 F.3d 955, 956 (7th Cir. 2002). Similarly, being able to read a computer screen for long periods of time is not a major life activity.

Working is a major life activity. However, to demonstrate a significant limitation on her ability to work, it is not enough for the plaintiff to show that her impairment "simply prevented [her] from performing one narrow job for one employer." Best v. Shell Oil Co., 107 F.3d 544, 548 (7th Cir. 1997); see also, 29 C.F.R. § 1630.2(j)(3)(i). Rather, the plaintiff must show that she was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." Id.; see also, Weiler v. Household Finance Corp., 101 F.3d 519, 525 (7th Cir. 1996). The plaintiff has failed to make such a showing.

Accordingly, the court finds that the plaintiff has not established that she was suffering from a physical or mental impairment that substantially limited one or more of her major life activities. 42 U.S.C. § 12102(2)(A). Therefore, the plaintiff has failed to establish the first requirement of a prima facie case. See Jackson, 414 F.3d at 810. Since the undisputed facts fail to demonstrate that the plaintiff suffered from a physical or mental impairment that substantially limited one of more of her major life activities, she has not established that she

-18-

has a disability within the meaning of the ADA. Accordingly, it is unnecessary for the court to address whether the plaintiff was "qualified individual" able to perform the essential functions of her job or whether she suffered an adverse employment action as a result of her disability.

In sum, the plaintiff has not established a prima facie case of discrimination based on "disability" as defined in the statute when she was employed at METCO. Therefore, the defendant's motion for summary judgment on the plaintiff's claim of discrimination under the ADA will be granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that defendant Milwaukee Electric Tool Corporation's motion for summary judgment be and hereby is **granted**. (Docket #29).

Dated at Milwaukee, Wisconsin, this 27th day of September, 2007.

BY THE COURT:

    s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge